Reed v. Wright.

REED v. WRIGHT.

It is the right and duty of the judicial power in the state, to declare all acts of the Legislature made in violation of the constitution, to be void.

The legislature of Wisconsin territory could not curtail rights conferred, nor confer rights withheld by the ordinance of 1787.

Legislation in derogation of trial by jury and by proceedings according to the course of the common law is in conflict with that ordinance, and therefore void.

An act of the legislature of the territory of Wisconsin, entitled "an act for the partition of the half-breed land, and for other purposes," approved, January 16th, 1838, and an act supplementary thereto, approved June 22nd, 1838, and also an act passed by the Iowa legislature, approved January 25th, 1839, to repeal both of said acts, are repugnant to the ordinance of 1787, and also to the organic law of Wisconsin and Iowa, and are therefore void.

So also are judgments rendered by virtue of said laws.

Void judgments are never binding, but judgments merely voidable may be enforced until reversed by a superior authority.

Judgments from courts of general jurisdiction, cannot be collaterally impeached, unless absolutely void upon their face.

In an action of right, the plaintiff must recover upon the strength and validity of his own title, and should show a valid subsisting interest in the land. No such interest can accrue from a void judgment.

## Error to Lee District Court.

*Opinion by* KINNEY, J.   This was an action of right, brought in the district court of Lee county, by the plaintiff against the defendant to recover the south-east quarter of Sec. 2, in township 65 north, and range 5 west, within that tract of land known as the Half-Breed Sac and Fox reservation, in Lee county.

On the trial of the cause, the plaintiff in error having proved the defendant in possession of the land in controversy, at the time of the commencement of the suit, for the purpose of showing title to the land, offered in evidence; first, the treaty between the United States, and the Sac and Fox tribes of Indians, of date August 4th, 1824, making a reservation of lands for the use of the Half-Breeds of said tribes of Indians.

Also, an act of Congress approved June 30th, 1834, enti-

tled "An act to relinquish the reversionary interest of the United States, in a certain Indian reservation lying between the rivers Mississippi and Des Moines." Also an act of the territorial legislature of Wisconsin, approved January 16th, 1838, entitled "An act for the partition of the Half-Breed lands and for other purposes." Also an act of the territory of Wisconsin approved June 22d, 1838, entitled "An act supplementary to an act, entitled An act for the partition of the Half-Breed lands and for other purposes." Also an act of the territorial legislature of Iowa, approved January 25th, 1839, entitled "An act to repeal an act of the Wisconsin legislature, entitled An act for the partition of the Half-Breed lands and for other purposes," and an act supplementary thereto, approved June 22nd, 1838; which said laws and the treaty aforesaid, were read to the jury, and embodied into, and made part of the bill of exceptions. The plaintiff also offered two judgments, under and by virtue of the act of the Iowa legislature and the executions and returns thereon.

The Wisconsin act, repealed by the Iowa act, after reciting that it is expedient in order to the settlement of the Half-Breed tract, that the validity of the titles of the claimants should be determined, and that partition of said lands among those having claims should be made, or a sale thereof for the benefit of such valid claimants, enacts that all persons claiming any interest in said lands, under said treaty, and act of Congress, are required within one year from the passage of the act to file with the clerk of the district court of the county of Lee, Wisconsin territory, a written notice of their respective claims, designating the half-breed under whom they claim, and the extent of their claims, which notice was required to be accompanied with a true copy of all the title papers and deeds relating to the rights therein set forth.

Section 2nd provides that Edward Johnston, David Brigham and Thomas S. Wilson shall be commissioners for the purpose of taking and receiving the testimony concerning

the validity of claims presented and filed, each of whom is to receive six dollars per day for his services.

Section 11th provides that all persons claiming any interest in said lands under said treaty and act of Congress, who shall not file their claims as required by the statute shall be forever barred from setting up any right in said lands, or in the proceeds of the sale thereof, &c.

Section 12th appoints certain commissioners with powers, under the order and direction of the court of Lee county, to make sale &c., of the land.

The act of the Iowa legislature offered in evidence, after repealing in Sec. 1st the foregoing act, provides that the several commissioners appointed under that act to sit and take testimony, may immediately or as soon as convenient, commence actions before the district court of Lee county for the several accounts against the owners of the said half-breed lands, and give eight weeks notice in the Iowa Territorial Gazette to said owners, of such suit, and the judge of the said district court, upon the trial of such suits at its next term, shall if said accounts are deemed correct, order judgment for the amount and costs to be entered up against said owners, and said judgment shall be a lien upon said lands, and a right of redemption thereto, and said judgment when entered shall draw interest at the rate of twelve per cent per annum.

Sec. 3rd enacts that the words "owners" of the half-breed lands lying in Lee county shall be a sufficient designation in said suits.

Sec. 4th provides that all the expenses necessarily incurred by said commissioners in the discharge of their duties under said act, shall be included in the accounts.

Sec. 5th, that the trial of said suit or suits shall be before the court, and not a jury, and that the act shall receive a liberal construction, &c.

The judgments offered in evidence obtained by virtue of said act of the legislature of the territory of Iowa, are as follows: "And afterwards on the 30th day of August in the year 1839, the auditor appointed to examine and report

2

in the case of David Brigham v. The Owners of the half-breed lands, having examined witnesses &c., reports as follows, to wit: That David Brigham is entitled to receive from the owners of the half-breed lands the sum of eight hundred and eighteen dollars all of which is respectfully submitted."                    OLIVER WELD, Auditor.

Whereupon the court accepted the said report and ordered that the plaintiff recover of the said defendants the sum of eight hundred and eighteen dollars, the amount stated in the auditor's report, and costs in this behalf expended.

And in the case of Edward Johnston v. The owners of the half-breed lands lying in Lee county, the report and judgment are as follows. Now comes the auditor appointed by the court to examine, adjust, and allow the account of the plaintiff in the above entitled cause, to wit: H. T. Reid Esq. and makes report that he finds the sum of twelve hundred and ninety dollars to be due from said defendants, to the said plaintiff, which report is accepted by the court; whereupon it is ordered by the court that the plaintiff recover of the defendants the sum of twelve hundred and ninety dollars, together with costs of suit, &c.

The plaintiff also offered in evidence the execution issued upon the judgment in favor of Johnston, and the return thereon. The return is as follows:

"December 1st, 1842. Levied the within execution on the half-breed Sac and Fox reservation in Lee county, I. T., commonly called the half-breed tract. Advertised the same for sale December 1st, 1843. January 1st, 1843, sold the above described tract of land, bought by H. T. Reid, for the sum of twenty-eight hundred and eighty-four dollars 66-100. Seventeen hundred and sixty-two dollars 66-100 to be credited in full satisfaction of the within execution.                    HAWKINS TAYLOR, Sheriff."

The plaintiff also offered in evidence, the execution and return thereon, in the case of Brigham v. The owners of the half-breed lands, by which also it appears that on the same day, the said sheriff sold the said reservation or tract of land to the said Reid for the same sum.

The plaintiff then offered in evidence, a sheriff's deed executed to him in due form on the 2nd day of January 1843, in pursuance of said sales made under said executions, which embraced the land described in the declaration. The plaintiff also offered to prove that said land described in the declaration, was within the half-breed tract, and part and parcel of the same, and that the same was included in the sheriff's deed, and in the said act of Congress of 30th of June 1834.

To the introduction as evidence, to the jury, of the said judgments, executions, returns thereon and sheriff's deed the defendant objected and the court sustained the objection and refused to permit said evidence to go to the jury; whereupon the plaintiff excepted, and assigns the decision of the court excluding said evidence as error.

The statute regulating the action of right, provides that the plaintiff shall only recover upon the strength and validity of his own title. *Rev. Stat.* 531, §45. Having in order to a proper understanding of this case, and the important principles involved in the decision, noticed the evidence offered by the plaintiff to sustain his action, the treaty, act of Congress, and the acts of the Wisconsin and Iowa legislatures, relied upon by him, we will examine the questions so elaborately and ably discussed in the trial.

By the counsel for the defendant in error, it was contended that the Wisconsin and Iowa acts were unconstitutional, and consequently all proceedings under them absolutely void. While upon the other side, the unconstitutionality of the acts was not only denied, but it was claimed even if they were not constitutional, as the court rendering the judgments possessed general jurisdiction, it necessarily decided in favour of its jurisdiction, and if that was error, the party could have been relieved in an appellate court, upon writ of error; and that the propriety of the judgments could not be collaterally questioned.

Although many points have been made in this case, those which we deem most important are; first, were the acts of the Wisconsin and Iowa legislatures within the

power conferred upon them by Congress, and in conformity with the ordinance of 1787?

Second, did the district court of Lee county acquire any jurisdiction, under the Iowa act, to render the judgments which it did render? Third, can the judgments so rendered be collaterally impeached? And fourth, did the sale under the executions issued on said judgments, pass any title to the plaintiff in error?

The Wisconsin act is based solely upon the assumption of the Wisconsin legislature that it is expedient in order to the settlement of the half-breed tract, &c., that titles should be investigated and partition and sales made, and upon this assumption commissioners are appointed to examine the titles, with power to administer oaths, take affidavits, issue commissions for taking depositions, issue subpœnas and other process to compel the attendance of witnesses; and for this purpose they were clothed with as full and ample power, as was possessed by the district court.

The act of the Iowa legislature, although it repeals the Wisconsin act, yet it provides the manner in which the commissioners who were appointed under that act, shall proceed to collect the amount, which the legislature presupposes to be due them, for services rendered in ascertaining the titles to the half-breed lands, and therefore dependent upon the rights presumed to have accrued under the latter for its operation.

While it is the duty of courts of justice studiously to ascertain the intention of the legislature, when called upon to give construction and judicial sanction to their enactments, and as courts have, and will with great reluctance pronounce them unconstitutional, yet the books afford abundant instances in which courts have been constrained to declare the most solemn legislative acts, but gross violations of the fundamental law of the land. It has accordingly become a settled principle in the legal polity of this country, that it belongs to the judicial power; as a matter of right and duty to declare every act of the legislature

Reed *v.* Wright.

made in violation of the constitution, *or of any provision of it, null and void.* 1 Kent. Com. 450.

Under our form of government the legislature is not supreme. It is only one of the organs of that absolute sovereignty that resides in the whole body of the people. Like other departments of the government, it can only exercise such powers as have been delegated to it, and when it steps beyond that boundary, its acts, like those of the most humble magistrate in the state who transcends his jurisdiction, are utterly void. *Taylor* v. *Porter*, 4 Hill 140.

In this country, written constitutions form the basis of the general and state governments. From them, each branch derives its power, conferring on *each* department certain duties, restricting each within certain prescribed and limited spheres of action; the authority thus delegated cannot be passed with impunity.

The legislature as an important integral part of the state organization, derives all its sovereignty from the constitution which created it. It can make laws, but cannot subvert the constitution, which is the written will of the people, the supreme law of the land, and all legislation must be conformable with its provisions, if not, the act does not possess the least virtue or validity whatever. But as members of the legislature in the discharge of their duties, act under an oath to support the constitution, nothing will be presumed in favor of the unconstitutionality of the law. The violation should be clear and apparent before the act should be declared void. And to the judicial department of the government is entrusted the power to decide all questions of constitutional law.

The act of Congress establishing the territorial government of Wisconsin, provided that the legislative power of the territory should extend to all rightful subjects of legislation.

The act also provided, that the inhabitants of said territory, should be entitled to, and enjoy all and singular the rights, privileges and advantages granted and secured to

the people of the territory of the United States, north-west of the river Ohio by the articles of compact contained in the ordinance of the government of said territory passed on the thirteenth day of July, 1787, and should be subject to all the conditions, and restrictions and prohibitions in said articles of compact, imposed upon the people of said territory. By that solemn instrument, it is ordained and declared among other things, that for extending the fundamental principles of civil and religious liberty which form the basis, wherever these republics, their laws and constitutions are established, to fix and establish those principles as the basis of all laws, constitutions and governments which forever shall be formed in said territory, the inhabitants of said territory shall always be entitled to the benefits of the writ of habeas corpus, and of a trial by jury, of a proportionate representation of the people in the legislature, and of judicial proceedings according to the course of the common law.

All legislation of the territory of Wisconsin, should have been consistent with the principles engrafted into this charter of human rights and civil liberty. The legislature could not curtail any rights conferred upon the people by the ordinance, nor confer any rights withheld.

The great land-marks of national liberty, trial by jury, and judicial proceedings according to the course of the common law, so wisely secured to the inhabitants of the territory by the ordinance, were insuperable barriers against legislative encroachment. With the same propriety, might the legislature attempt to take from the citizen the benefit of the writ of habeas corpus as to forbid the right of trial by jury, and as well deny him religious freedom as to attempt to divest him of his property without judicial proceedings according to the course of the common law. Hence all legislation in derogation of these rights, is unconstitutional and void. But the ordinance of 1787 further declares, that no man shall be deprived of his liberty or property, but by the judgment of his peers or the laws of the land.

Reed *v.* Wright.

Law, Blackstone defines to be a rule, not a sudden transient order from a superior to, or concerning a particular person, but something permanent, uniform and universal. Therefore a particular act of the legislature to confiscate the goods of Titius or attaint him of high treason, does not enter into the idea of a municipal law, for the operation of the act is spent upon Titius only, and has no relation to the community in general. It is rather a sentence than a law, and Lord Coke in commenting upon the celebrated 29th Chap. of Magna Charta, says no man shall be deprived, &c., unless it be by the lawful judgment, that is verdict of equals, or by the law of the land, (to speak it once for all,) by due course and process of law. The phrase law of the land, is thus defined by an author. "By the law of the land is most clearly intended the general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities under the protection of general rules which govern society. Every thing which may pass under the form of an enactment, is not therefore to be considered the law of the land. If this were the case, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, and decrees and forfeitures in all-possible forms would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance, completely inoperative and void. The administration of justice, would be an empty form, an idle ceremony, and judges would sit to execute legislative judgments and decrees, not to declare the law or administer the justice of the country."

In the case of *Hoke* v. *Henderson*, 4 Dev., 15; Chief Justice Ruffin also says, that statutes which would deprive a citizen of the rights of person or property, without a regular trial according to the course and usage of the common law would not be the law of the land, in the sense of the

constitution. Judge Bronson in the case of *Taylor* v. *Porter*, 4 Hill, (in speaking on this subject) says the meaning of the section, there seems to be, that no member of the state shall be disfranchised or deprived of any of his rights or privileges unless the matter shall be adjudged against him upon trial had according to the course of the common law.

Did the act of the Wisconsin legislature seek to deprive the owners of the half-breed lands of their property, by judicial proceedings according to the course of the common law? If not, the act was in conflict with the supreme law of the land, and could not have been enforced.

The act appointed three commissioners to examine and report to the district court of Lee county, upon the titles set up to the half-breed lands. All persons owning any interest in said lands, were required to file with the clerk of the district court a written notice of their respective claims. It was made the duty of the commissioners under the act, to take and receive testimony concerning the validity of claims thus presented and filed, and report to the court the names of the owners and the proportion to which each was entitled, &c. The act made it imperative upon the court to render judgment at the next succeeding term after filing the report in favour of the claimants, for the amount to which they were respectively entitled, according to said report, unless exceptions were filed by the fourth day of said term. And by said act, all persons claiming any interest in said land under the treaty and act of Congress, who did not file their claims as aforesaid, were forever barred from setting up any right in said lands or the proceeds of the sale thereof. The act also appointed certain commissioners, authorizing them or a majority, to proceed and make sale of said lands from time to time, according to the judgment or order of the court, to make surveys, &c.; and they were authorized upon the receipt of the consideration of the sales and ratification of the report by the court, to execute and deliver to the purchasers proper deeds, which should be effectual to vest in the re-

spective purchasers the absolute title in fee simple in sev-
eralty of the lands so sold and conveyed, free and clear
of all right and claim of all persons under said treaty,
and act of Congress. All expense of the proceedings were
required to be paid out of sales, &c. The act also pro-
vided that the jurisdiction of the said court, in the matter
referred to in said act, should be exclusive, and *that no
proceeding should be instituted or sustained in that or
any other court, either at law or equity, under the general
law relating to the partition of lands, for the purpose of
effecting the partition or sale of said lands.*

We have no hesitation in coming to the conclusion, that
this act under which Johnston and Brigham's services were
rendered in ascertaining and reporting upon the title to
the half-breed lands, was a most unwarrantable assump-
tion of legislative power. It proceeds upon the hypothesis
that it is necessary to ascertain and settle the title to cer-
tain lands. For this purpose, commissioners are appoint-
ed and clothed with most extraordinary authority.

The judgment of the court upon their report, is to settle
the title to more than one hundred thousand acres of val-
uable land, not by any proceeding according to the course
of the common law, not by service of process by which
the parties could have a day in court, not by a general law
of the land, operating upon the whole community alike,
but by a special and limited act violating all of these val-
uable safeguards.

The act wrested from the court all judicial discretion, as
it was required in unqualified terms to render judgment
in *favor* of the claimants, for the amount the said commis-
sioners should report them entitled to.

This wonderful legislation does not stop here, but if per-
sons who held good and valid titles to said lands did not
file their claims as required by the act, they were forever
barred from setting up any right in said lands, or the pro-
ceeds of the sale thereof.

All equitable and legal proceedings under the *general
law* of partition were forbidden. Sale commissioners were

appointed with full power to sell said lands, and in this manner was title to be divested and imparted.

Thus A owning a good and valid title in said lands who neither consented to the act or proceeding, not having incurred any legal liability, if he should fail to file his claim, he would become disseized of his freehold, deprived of his estate, and all for the reason that he did not file his evidence of title. There was no public necessity for such an act. The general partition law was available for the purpose of ascertaining and settling the various interests of those holding titles in said lands; and if such a pretence as the one assumed by the legislature for the passage of this act, were a justification, then indeed, with the same propriety might they pass an act requiring the owners of a particular block of lots, the title to which might be in controversy, to file their respective titles, and if either of them failed to do so the penalty should be a forfeiture of the interest owned.

· The power assumed by the legislature in this act, if sustained by the courts, would lead to the most fearful consequences, as it would enable them at will, by special and limited laws to settle all controversies of title, and to bring about this object the property of one person could be taken against his consent, and given to another. In the case of *Wilkinson* v. *Leland*, 2 Peters 657, Judge Story says "that government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body without any restraint." The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred; at least no court of justice in this country would be warranted in assuming that the power to violate and disregard them, a power so repugnant to the common principles of justice and civil liberty, lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people. The people ought not to be presumed to part with rights so vital to their security and well being, without very strong

and direct expressions of such intention. The power of the Wisconsin legislature was derived from Congress which extended to all rightful subjects of legislation, and subject also to all the restrictions and provisions of the ordinance of 1787. The organic law conferréd no power on the legislature to pass such an extraordinary act. In the case of *Taylor* v. *Porter*, 4 Hill 144, Judge Bronson says, "we know of no case in which a legislative act to transfer the property of A to B without his consent, has ever been held a constitutional exercise of legislative power in any state in this Union. On the contrary, it has been constantly resisted as inconsistent with just principles, by every tribunal in which it has been attempted to be enforced. The security of life, liberty and property, lies at the foundation of the social compact, and to say that this grant of legislative power includes the right to attack private property, is equivalent to saying that the people have delegated to their servants the power of defeating one of the great ends for which the government was established. Neither life, liberty, nor property, except when forfeited by crime, or when the latter is taken for public use, falls within the scope of legislative power."

Laws affecting life, liberty, and property, must be general in their application, operating upon the entire community alike. It is the boast and pride of our institutions that we have no favored classes. No person so high that he does not require the care and protection of the law, no person so low as not to be entitled to them. The life, liberty and property of one citizen rest upon the same legal foundation as those of another, and if these are taken from him, it must be by a law which operates upon all alike. If it were otherwise, all would be at the mercy of legislative power, and the dearest rights of the citizen would not be worth possessing.

Whatever might have been the exigencies which would seem to require an act to settle the different conflicting titles to the half-breed lands, still the legislature had no right under the organic law and ordinance, to pass a

special and limited act confined to a particular class of individuals by which they were to be deprived of their property. In common with all other persons of the territory, the owners of these lands could only be divested of them by judicial proceedings according to the course of the common law.

It was under this act that Johnston and Brigham performed their services, for which the entire tract was sold, and at said sale purchased by Reid the plaintiff in error. As in our view the act was utterly repugnant to the ordinance of 1787, and was not within any express power conferred upon the legislature by the act of Congress, it was unconstitutional and void, and no rights could possibly have accrued under it.

Iowa formerly constituting a part of the Wisconsin territory, passed into a separate territorial government in 1838, and the laws of Wisconsin by the organic law were extended over the new territory. The first legislature by an act approved January 25th, 1839, repealed the Wisconsin act, but provided that the several commissioners appointed by said act to take testimony, might immediately commence actions before the district court of Lee county, for their several accounts against the owners of the said half-breed lands, by giving eight weeks notice in the Iowa Territorial Gazette to said owners of such suits. The judge of said court was required, if said accounts were deemed correct, to order judgment for the amounts and costs to be entered up against said owners, which was to be a lien, &c., upon said lands. This judgment was to draw interest at the rate of 12 per cent.

The statute also provides that the words "owners of the half-breed lands lying in Lee county" should be a sufficient designation and specification of the defendants in said suits. *The trial is required to be before the court, and not a jury.* By virtue of this act Johnston and Brigham commenced their suits against the owners, &c., as such, and not against any person by name. There does not appear to have been any appearance in court on the part of the

owners, when the judgments before mentioned were rendered, on which the said executions were issued, and the entire tract sold by the said sheriff to the plaintiff in error.

The unconstitutionality of the Iowa act cannot well be controverted. It is not only nugatory of itself, but provides for the collection of claims which accrued under an unconstitutional law. The same act which invokes the aid of a court to render judgments in favour of invalid claims, denies to those whom it constitutes defendants, the right of a trial by jury. Instead of leaving the plaintiffs to pursue the remedy prescribed by the law of the land, the legislature assumes a power not delegated to it by the law of Congress, and in direct conflict with the provisions of the ordinance of 1787, and in violation of the general laws of the territory. The suits are not brought against persons by name, but against them as owners of certain property, and on notice by publication, judgments are rendered and lands sold to a large amount.

The general laws of the territory of Iowa, authorized actions of debt to be prosecuted against defendants only in their proper names, and by personal service of process, and entitled them to trial by jury. The act of the Iowa legislature adjudged that the owners of the half-breed lands were indebted to the commissioners, and authorized them to sue such owners in the manner before mentioned, not by personal service, but by publication in a newspaper. The court is to ascertain of itself, and not by jury, the amount of the indebtedness, and to enter judgment for the same, which judgment is to be a lien on said land and draw twelve per cent. interest, when the general laws of the territory only authorized six per cent. This is not according to the law of the land. Such legislation is inconsistent with the principles of free government, for it asserts a power on the part of the legislature entirely inconsistent with the liberty of the citizen. It is not within the scope of rightful legislation, for it does not profess to declare a general rule of action for the citizen, but is partial, limited and exclusive. It infringes the clause of the ordinance of

1787, which guaranties judicial proceedings, according to the course of the common law, and violates that clause of the ordinance which declares that no man shall be deprived of his liberty or property, but by the judgment of his peers and the law of the land; and consequently it is utterly void. It could not confer any additional authority upon the court, it could take no power from it which it otherwise possessed. It could not rightfully create any new facilities for Johnston and Brigham to prosecute their claims, and their legal remedy was the same as if the act had not been passed, and as it was a dead letter upon the statute, no rights or immunities could accrue under it.

It is necessary to determine then, whether the court had power and jurisdiction under the act of the Iowa legislature to enter the judgments which it did enter. It is not contended that the general laws of the territory gave the jurisdiction, or that it was conferred by anything except the said special act. This act we have shown to be unconstitutional and void, and it being the only act which attempts to confer authority upon the court to enter the judgments, it is necessary to inquire whether a jurisdiction thus conferred can be exercised, or in other words, whether an unconstitutional act can confer jurisdiction at all. In the case of *Malbury* v. *Madison*, 1 Cond. 267, Chief Justice Marshall lays down the doctrine in the following clear, pointed and forcible language:

"The question whether an act repugnant to the constitution can become the law of the land, is a question deeply interesting to the United States, but happily not of an intricacy proportioned to its interest. It seems only necessary to recognize certain principles supposed to have been long and well established to decide it."

"That the people have an original right to establish for their future government such principles as in their opinion shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected."

"The exercise of this original right is a very great exertion, nor can it, nor ought it to be frequently repeated.

The principles therefore so established are deemed fundamental. And as the authority from which they proceed is supreme, and can seldom act, they are designed to be permanent."

"This original and supreme will organizes the government, and assigns to different departments their respective powers. It may either stop here, or establish certain limits not to be transcended by these departments."

"The government of the United States is of the latter description. The powers of the legislature are defined and limited, and that these limits may not be mistaken or forgotten the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may at any time be passed by those intended to be restrained. The distinction between a government with limited and unlimited powers is abolished, if these limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation. It is a proposition too plain to be controverted, that the constitution controls any legislative act repugnant to it, or that the legislature may alter the constitution by an ordinary act."

"Between these alternatives there is no middle ground. The constitution is either a superior permanent law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts is alterable when the legislature shall please to alter it."

"If the former part of the alternative be true, then a legislative act contrary to the constitution is not law. If the latter part be true, then written constitutions are absurd attempts on the part of the people, to limit a power in its own nature illimitable."

"Certainly all those who have framed written constitutions, contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government *must be, that an act of the legislature repugnant to the constitution is void.*"

"This *theory* is essentially attached to a written consti-

tution, and is consequently to be considered by the court as one of the fundamental principles of society."

"If an *act* of the *legislature repugnant to the constitution is void*, does it notwithstanding its invalidity bind the courts and oblige them to give it effect? Or in other words, though it be not law does it constitute a rule as operative as if it was law? This would be to overthrow in fact, what was established in theory; and would seem at first view an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration. It is emphatically the power and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each."

"So if a law be in opposition to the constitution. If both the law and the constitution apply to a particular case, so that the court must either decide the case conformably to the law, disregarding the constitution, or conformably to the constitution, disregarding the law, the court must determine which of these conflicting rules govern the case. This is of the very essence of judicial duty."

"If then the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution and not such ordinary act, must govern the case to which they both apply."

"Those then who controvert the principle, that the constitution is to be considered in court as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution and see only the law. This doctrine would subvert the very foundation of all written constitutions. It would declare that an act which according to the principles and theory of our government is entirely void, is yet in practice completely obligatory. It would declare that if the legislature shall do what is. expressly forbidden, such act notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence,

Reed *v.* Wright.

with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits and declaring that these limits may be passed at pleasure."

"That it thus reduces to nothing what we have deemed of the greatest importance in political institutions, a written constitution, would of itself be sufficient (in America where written constitutions have been viewed with so much reverence,) for rejecting the constitution."

But it was contended by the counsel for the plaintiff in in error, that the constitutional question cannot now be raised. That the court rendering the judgments, necessarily decided in favor of the constitutionality of the act, and of its own jurisdiction, and that decision became the law of the case, and if it was error it could only have been enquired into on writ of error. From an examination of all the authorities referred to, we are satisfied that this position could not be successfully controverted, if the act by virtue of which the court rendered judgments were not void. But the act being in direct derogation of the constitution, did not confer any power upon the court to act in the premises. Hence all of its proceedings under it are not mere errors or irregularities, but absolutely void. There is a plain distinction in all books upon the subject, between judgments void and only voidable. The former may always be questioned when attempted to be enforced; the latter never after the limitation of the time prescribed for testing their irregularities, in a superior or appellate court.

The leading distinction between judgments and decrees void, and such as are voidable only, is, the former are binding no where, the latter any where until reversed by a superior authority. *Hollingsworth* v. *Barbour, et al.,* 4 Peters 466.

A party is not obliged to sue out a writ of error to reverse a void judgment. He may wait until the judgment is attempted to be enforced on proceedings under it, and then attack it collaterally. But with erroneous judgments it is different, if he sleeps upon his rights, his remedy is lost.

4

The court possessed no power under the act, to make any decision either in favour of its jurisdiction or for any other purpose. It is true, it was a court of general jurisdiction, and had jurisdiction over the action of debt, as was contended in the argument. But the proceedings were conducted exclusively under the act, and instead of leaving the court to exercise its general jurisdiction, it was required to render judgments if the said accounts were deemed correct. Its entire proceedings as prescribed by the act, were essentially different from ordinary proceedings in actions of debt. The action of the court is based exclusively upon a void act which is made a part of the record in this case, and as the court did not acquire any jurisdiction over the parties under the act, and could not rightfully enter up any judgment, the judgments are utterly void.

While therefore, it is now well settled that judgments emanating from courts of general jurisdiction, cannot be impeached collaterally for error or irregularities. Still judgments absolutely void upon their face emanating from the same courts, may be so impeached. All presumptions are in favor of the former, but nothing can be presumed in favor of the latter. *McComb* v. *Elliott*, 8 S. & M. 505; *Enos* v. *Smith*, 7 *ib.* 85.

The case of *Voorhees* v. *The Bank of the United States*, 10 Peters 449; so confidently relied upon by the counsel for the plaintiff in error, we think when properly understood sustains this position and enforces this distinction.

While Judge Baldwin in delivering the opinion of the court in that case, lays down the doctrine with a perspicuity and power seldom surpassed in judicial decisions, that the judgment of a court of general civil jurisdiction, cannot be impeached collaterally for mere errors or irregularities. He also says, "The errors of the court do not impair their validity: binding till reversed, any objection to their full effect must go to the authority under which they have been conducted. If not warranted by the constitution or law of the land, our most solemn proceedings can confer no right which is denied to any judicial act under

colour of law, which can properly be deemed to have been done *coram non judice*, that is by persons assuming the judicial functions in the given case, without lawful authority. The line which separates error in judgment from the usurpation of power is very definite, and is precisely that which denotes the case where a judgment or decree is reversible only by an appellate court, or may be declared a nullity collaterally when it is offered in evidence in an action concerning the matter adjudicated, or purporting to have been so. In the one case it is a record purporting absolute verity, in the other mere waste paper."

The decision of the court in the above case, sustained the judgment of the court of common pleas of Hamilton county Ohio, but the court say, in speaking of the objection to the proceedings, "none of them affect the jurisdiction of the court, or its authority to order or confirm the sale, the acts omitted to be recited in the record are not judicial but ministerial, to be performed by the clerks or auditors."

But the learned judge cites the decision of the court in *Thompson* v. *Tolmie*, 2 Pet. 157, in which the court declare "that the general and well settled rule of law in such cases is, that when the proceedings are collaterally drawn in question, and it appears in the face of them that the subject matter was within the jurisdiction of the court, they are voidable only. The errors and irregularities, if any exist, are to be corrected by some direct proceeding, either before the same court to set them aside, or in an appellate court. If there is a total want of jurisdiction, the proceedings are void and mere nullities, and confer no right and afford no justification, and may be rejected when collaterally drawn in question."

In the case of *Rose* v. *Hemely*, 2 Cond. 100, in which the judgment of a foreign court was collaterally attacked, Chief Justice Marshall in delivering the opinion of the court, says "The power of the court then is of necessity examinable to a certain extent, by that tribunal which is compelled to decide whether its sentence has changed the

right of property. The power under which it acts must be looked into, and its authority to decide questions which it professes to decide must be considered." He also says, "Upon principle it would seem that the operation of every judgment must depend on the power of the court to render that judgment, or in other words, in its jurisdiction over the subject matter which it has determined. In some cases that jurisdiction depends as well on the state of the thing, as on the constitution of the court."

In the case of *Lessee of Hickey et al.* v. *Stewart et al.*, 3 Howard 750, it was insisted that the jurisdiction of the court over the subject matter of the decree could not be inquired into by the supreme court, nor by the court below, when brought before either collaterally. The decree collaterally assailed, was rendered by the supreme court of the territory of Mississippi, decreeing certain lands to the heirs of Robert Starkie. One of the main questions before the supreme court of the United States was, whether this decree was void, the court having no jurisdiction of the subject matter of the decree, or only erroneous and voidable. The court say if the former, then its validity was inquirable into in the current court when offered in evidence, and it ought to have been rejected. The court decide that the court rendering the decree, had no jurisdiction, and that the whole proceeding was a nullity.

When a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment until reversed is regarded as binding in every other court. But if it acts without authority, its judgments and orders are regarded as nullities; they are not voidable but simply void, and form no bar to a remedy sought even prior to a reversal in opposition to them. They constitute no justification and all persons concerned in executing such judgments or sentences are considered in law trespassers. This distinction runs through all the cases on the subject, and it proves that the jurisdiction *of any court* exercising authority over a subject, may be inquired into in every court where

the proceedings of the former are relied on and brought before the latter, claiming the benefit of such proceedings. *Elliott* et. al. v. *Piersall* et. al., 1 Peters 340.

In the case of *Shrivers Lessee* v. *Linn et al.*, 2 How. 43, Judge McLane in delivering the opinion of the court says, "No court however great may be its dignity, can arrogate to itself the power of disposing of real estate without the the forms of law. It must obtain jurisdiction of the thing in a legal mode, a decree without notice would be treated as a nullity; and so must a sale of land be treated, which has been made without an order or decree of the court, though it may have ratified the sale."

See also, *Mills* v. *Martin*, 19 John 7; *Shelton* v. *Tiffin et al.*, 6 Howard 163; 3 John 459; *Proctor* v. *Newhall*, 17 Mass. 81, *Bloom* v. *Burdick*, 1 Hill 130.

In the last case the court declare that it is a cardinal principle in the administration of justice, that no man can be condemned or divested of his rights until he has had an opportunity of being heard He must either by serving process, publication notice, appointing a guardian, or some other way be brought into court, and if judgment is rendered against him before that is done, the proceedings will be as utterly void, as though the court had undertaken to act when the *subject matter* was not within its cognizance, and cites *Beman* v. *Fitch*, 15 John 121; *Bigelow* v. *Stevens*, 19 *ib.* 39; *Mills* v. *Martin*, *ib.* 7. The court also say the distinction between superior and inferior courts, is not of much importance in this particular case, for *whenever it appears* that there was a want of jurisdiction the judgment will be void in whatever court it was rendered. *Hollingsworth* v. *Barbour*, 4 Peters 466.

We have no hesitation, from our examination of the authorities bearing upon this important branch of the case, in assuming as the settled doctrine of the books, that judgments rendered without the court having acquired a jurisdiction either over the subject matter or the parties, are mere nullities, and may be declared void by a competent tribunal whenever attempted to be enforced.

In the case before us, the want of jurisdiction over the parties appears upon the face of the proceedings. Suit is brought and judgments entered against *"owners"* of certain lands.

Parties cannot be brought into court in this manner, and judgments cannot be so rendered. These judgments are void as the court acquired no jurisdiction. Time cannot sanctify them, nor courts enforce them. For all judicial purposes they are as though they had not been rendered, and?although the statute bars a writ of error, they neither bind nor conclude any one.

But it is said that Wright the defendant in error, cannot object to the sale &c., he being only in possession without pretence of title.

The statute regulating the proceedings in actions of right, provides that the plaintiff shall recover upon the strength and validity of his own title. Hence the plaintiff offered the treaty act of Congress, legislative acts, judgments, executions and returns, in evidence. This was the source from which he claimed to have derived title. If the sales upon the execution did not confer title he could not recover, even against a stranger. In order to entitle Reid to recover under the statute, he should have a valid subsisting interest in the land. As the judgments were void, no interest whatever passed in consequence of the sales under the executions, and therefore, the plaintiff could not sustain his action against any one, and the court very properly we think, refused to permit the evidence to go to the jury.

Other positions were taken by the counsel for the plaintiff in error, beside these we have noticed. The arguments and authorities were presented to the consideration of the court with great power and ability. But as the case has presented itself to our minds, we have not thought it necessary to notice them in this decision.

We have been fully impressed with the importance of this case to the plaintiff in error, who purchased these lands under a judicial sale, and fully felt all that reluctance

which should ever characterize courts, when they declare legislative acts unconstitutional, and judgments of courts void. Still it has been no less a duty to decide in favor of the judgment of the court below.

Judgment affirmed.

*Henry W. Starr, C. Walker* and *H. T. Reid,* for plaintiff in error.

*Geo. C. Dixon,* for the defendant.